## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Ryan Talbot, being duly sworn, depose and state as follows:

1.       I am a Special Agent with the Internal Revenue Service, Criminal Investigation ("IRS-CI") and have been so employed since August 1998. My responsibilities as a Special Agent include the investigation of possible criminal violations of the Internal Revenue Laws (26 U.S.C. § 7201 *et seq.*), the Bank Secrecy Act (31 U.S.C. § 5311 *et seq.*), the Money Laundering Control Act (18 U.S.C. §§ 1956, 1957, and 1960), and related offenses. I have completed 24 weeks of specialized training at the Federal Law Enforcement Training Center in Glynco, Georgia, where I received extensive training in conducting criminal investigations. Topics covered included the investigation of financial crimes such as tax evasion, failure to collect or pay over taxes, filing of false tax returns, failure to file tax returns, money laundering, and conspiracy to commit tax and other crimes. I also received instruction on probable cause as it relates to search and seizure warrants and arrest warrants. During my employment with IRS-CI, I have conducted and/or assisted in criminal investigations involving tax fraud, identity theft, money laundering, violations of the Bank Secrecy Act, and other federal violations. I have conducted and/or assisted in the execution of numerous search and arrest warrants.

2.       Since 2005 I have been assigned to the Financial Investigations Team with the Drug Enforcement Administration.  I have conducted and/or participated in investigations of persons and organizations involved in narcotics trafficking and money laundering activities.  I have conducted and/or participated in investigations of companies that are involved in the money laundering of proceeds derived from narcotics trafficking.  I have attended conferences related to the investigation of asset forfeiture and money laundering. I am familiar with the books, records, and documents that businesses are required to maintain.  I am also familiar with the reports that

1

are required to be prepared for government agencies.

3.     Based upon my training and experience I know that narcotics traffickers amass large amounts of cash proceeds from the sale of narcotics and attempt to legitimize these proceeds by laundering the profits.  Narcotics traffickers also at times utilize domestic and foreign banks or financial institutions with attendant services, including sales of securities, cashier checks, money drafts, letters of credit, and other financial instruments.  I also know that unexplained wealth is probative evidence of trafficking in controlled substances.

4.     Narcotics traffickers accumulate large amounts of cash proceeds from the sale of narcotics in the United States.  The traffickers, or those associated with the traffickers, frequently attempt to create the appearance of legitimacy to those proceeds; (*i.e.*, "launder" them by making them appear to have been generated by a legitimate source).  The traffickers must also devise various methods to remit those narcotics proceeds to suppliers of narcotics located in Colombia and other South American countries, which are known source locations of narcotics, without alerting governmental or law enforcement agencies in either the United States or the South American countries.

5.     In order to accomplish this goal, narcotics traffickers frequently utilize domestic and foreign banks and/or financial institutions in an attempt to make their narcotics profits appear to be from legitimate sources and to move those profits through the financial system into the countries where the narcotics are manufactured.

6.     A popular method of laundering narcotics proceeds is for narcotics traffickers to use a third party to "sell" their narcotics proceeds in the United States for pesos in Colombia. This practice, commonly known as the Black Market Peso Exchange ("BMPE"), is centered on a BMPE broker who can bring the drug proceeds and the legitimate pesos together.  In a common BMPE

conspiracy, a BMPE broker will identify a South American businessperson, who imports goods from places such as the United States, China, or Panama. The BMPE broker will offer the South American businessperson an opportunity to pay the debt owed to the exporter in the foreign country at a significant discount compared to making the payment through a South American bank. The South American businessperson who agrees to this scheme will then turn over the payment for the imported goods in the form of pesos to the BMPE broker who in turn will contact a Drug Trafficking Organization ("DTO"). When the BMPE broker contacts the DTO, the broker will offer the pesos in South America in exchange for the narcotics proceeds that are located in the United States.

7.      The BMPE broker will then arrange to have the narcotics proceeds picked up by a member of the BMPE broker's organization.  These money pick-ups will usually occur between two people who have never met before and will most likely never meet again.  These pick-ups frequently involve several hundred thousand dollars.  Following the money pick-up, the BMPE broker arranges to forward those proceeds to the exporter in the United States, which is frequently accomplished by remitting those proceeds to the exporter through a third party.  Frequently, these third parties are found in different geographical locations than the exporter, often where the DTO is located, which avoids the transportation of illicit dollars (proceeds) to the location where the exporter is located.

8.      The information contained in this affidavit is based on statements and information from witnesses, my personal knowledge and observations during the course of this investigation, my personal training and experience as a criminal investigator, and my review of records, documents, and other physical evidence obtained during this investigation, among other things.

9.      Because this affidavit is submitted for the limited purpose of establishing probable

cause for the requested criminal complaint, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth herein only those facts that I believe are necessary to establish probable cause to support the warrant requested herein.

## PURPOSE OF THE AFFIDAVIT AND STAUTORY FRAMEWORK

10.     I submit this affidavit in support of an application for a criminal complaint alleging that, beginning no later than November 2017 and continuing until the present, JOSE EDINSON MONTEALEGRE-FERNANDEZ ("MONTEALEGRE") and JORGE ALBERTO GOMEZ-RAMIREZ ("GOMEZ") participated in a money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h).  Venue lies in within the District of Massachusetts because, as set forth below, multiple financial transactions took place within the District of Massachusetts. 18 U.S.C. § 1956(i)(1)(A) and 18 U.S.C. §1956(i)(3).

11.     Title 18, United States Code, Section 1956(a)(1)(B)(i) makes it illegal to conduct or attempt to conduct a financial transaction involving the proceeds of specified unlawful activity, knowing that the transaction is designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of property known to be the proceeds of specified unlawful activity.  Additionally, Title 18, United States Code, Section 1956(h) makes it illegal for any person to conspire to commit such an offense.

12.     Narcotics trafficking in violation of 21 U.S.C. §§ 841(a)(1) and 846 constitutes "racketeering activity" pursuant to Title 18, United States Code, Section 1961(1)(D), which is a "specified unlawful activity" under 18 U.S.C. § 1956(c)(7)(A).  Additionally, because narcotics trafficking is illegal in each of the countries involved in this scheme, even proceeds generated in a foreign country constitute proceeds of "specified unlawful activity" for purposes of Section 1956,

so long as a financial transaction occurs in whole or in part in the United States.  18 U.S.C. § 1956(c)(7)(B)(i).  Therefore, proceeds of narcotics trafficking are proceeds of specified unlawful activity.

## PROBABLE CAUSE TO BELIEVE MONTEALEGRE AND GOMEZ PARTICIPATED IN A MONEY LAUNDERING CONSPIRACY

13.     Since November 2017 until the present, the DEA has been investigating MONTEALEGRE and GOMEZ for participating in a money-laundering conspiracy to repatriate the proceeds of narcotics trafficking from locations throughout the world to the Republic of Colombia.  The DEA was first provided information about MONTEALEGRE and GOMEZ by a Confidential Source ("CS-1"), who resides in Colombia.[1]  According to CS-1, MONTEALEGRE is a Colombian male living in Cali, Colombia, who regularly repatriates the proceeds of narcotics trafficking to Colombia.  CS-1 stated that CS-1 first met MONTEALEGRE when they were both serving prison terms in the United States in the early 1990s.[2]  CS-1 and MONTEALEGRE reconnected in 2008-2009, when CS-1 returned to Colombia and met with MONTEALEGRE at a mall.  Because of CS-1's connection to the United States and their shared experience in prison, MONTEALEGRE assumed that CS-1 had contacts in the United States who could assist with money laundering.   Once CS-1 began working with the DEA in 2016, he/she told MONTEALEGRE that CS-1 had reestablished contacts in the United States and was willing to work.

---

1 CS-1 has been a confidential source for DEA since 2011.  CS-1 has been cooperating in exchange for monetary benefits.  CS-1 has also been told that he may receive relocation/immigration benefits as a result of his/her cooperation to ensure his/her safety when that cooperation becomes known.  CS-1's information has been corroborated to the extent possible and DEA agents believe it to be reliable.  CS-1 is willing to testify.
2 According to MONTEALEGRE's criminal history report, MONTEALEGRE was arrested in 1992 for Conspiracy to Deliver Cocaine, was convicted in U.S. District Court for the Eastern District of New York and was sentenced to 188 months of incarceration.

14.     On or about January 17, 2018, CS-1 attended a scheduled meeting with MONTEALEGRE at MONTEALEGRE's office in Cali.  Before the meeting, agents showed CS-1 a photograph of GOMEZ, who previously was identified as a possible associate of MONTEALEGRE.  CS-1 stated that he/she did not know the person in the photograph by name but had seen GOMEZ in the company of MONTEALEGRE in December 2017.  After meeting with agents, CS-1 travelled to MONTEALEGRE's office and met with MONTEALEGRE. During the meeting, MONTEALEGRE introduced CS-1 to his partner, GOMEZ. MONTEALEGRE and GOMEZ discussed the movement of money in both Chile and New York with CS-1, although GOMEZ did most of the talking.  After the meeting, which was not recorded, CS-1 confirmed with agents that he had met with GOMEZ, the same individual whose photograph he had just viewed, at the meeting.  The following day, CS-1 provided a photograph of MONTEALEGRE to agents that CS-1 had downloaded from Facebook.

15.     The investigation into MONTEALEGRE and GOMEZ has consisted mainly of undercover Money Pick-Up ("MPU") operations.  Specifically, MONTEALEGRE and GOMEZ needed assistance in schemes that involved picking up large amounts of drug proceeds at various locations and subsequently laundering those funds.   The investigators' contact with MONTEALEGRE and GOMEZ was primarily through an undercover agent ("UC-1") or CS-1. For each of these transactions, UC-1 or CS-1 typically received a contract for an MPU via WhatsApp, a telecommunications application using end-to-end encryption (although CS-1 sometimes met in-person with MONTEALEGRE and/or GOMEZ).  Once the terms of the contract were agreed upon, UC-1 received the details of the MPU, including date, location, contact information, and any necessary codes.  After the cash was picked up by the designee of UC-1, MONTEALEGRE and/or GOMEZ then directed that the funds be wired to various individuals and

6

entities.  MONTEALEGRE and/or GOMEZ also provided UC-1 or CS-1 with the names of the recipients and their related bank account details, and DEA agents wire transferred funds to the accounts.  The investigators created an undercover bank account ("UC Account") to assist in the laundering of the cash, and the funds UC-1 picked up were deposited into and then wired out of the UC Account, less a commission payment for laundering the funds.

16.     Based on my training, experience, and the communications received from MONTEALEGRE and GOMEZ, I believe that the funds involved in the MPU operations were the proceeds of narcotics trafficking.  This conclusion is based in part on the amount of bulk cash involved, the provision and/or use of code-words during the MPU operations, the expressed need to avoid scrutiny from financial institutions, and the nature of the conversations with MONTEALEGE and GOMEZ during the investigation.  Additionally, throughout this investigation, UC-1 has held himself out as an individual capable of picking up bulk currency throughout the world and laundering that money through bank accounts based in the United States and abroad.  UC-1's role included coordinating the actual MPU in domestic and foreign locations, facilitating the transfer of those funds into a domestic bank account within the United States, and transferring those funds to additional accounts designated by MONTEALEGRE and/or GOMEZ. I believe, based upon my training, experience and the training and experience of other law enforcement agents involved in the investigation, that none of these actions would be necessary if the funds in question were proceeds of legitimate business.  I further believe that it was implicit that the funds involved in the MPU operations were the proceeds of narcotics trafficking and that the intent of MONTEALEGRE and GOMEZ was to enlist the assistance of UC-1 or CS-1 in integrating the proceeds into the financial system and subsequently laundering these proceeds. This belief is supported by the specific language in the conversations, use of items as identification

("tokens"), and the "code words" used by MONTEALEGRE and/or GOMEZ, as well as the individuals, oftentimes unidentified, who delivered the bulk cash, as described below.

17.     The connection to narcotics trafficking was also more express at various times during the investigation.  For example, as set forth below, subsequent investigation of some of the couriers involved in making deliveries of the money contracted by MONTEALEGRE and GOMEZ led to seizures of drugs.

18.     As further detailed below, MONTEALEGRE and/or GOMEZ directed that funds from the "pick-ups" be sent to accounts of various entities and individuals.  For the transactions that are discussed below, there was no known legitimate business contact and there was no negotiation to purchase goods or services from that entity.   Based on my training and experience, the absence of ordinary business contact is an additional indicator that the nature of this transaction is not commercial but, rather, is designed to help conceal the nature and source of tainted funds.

19.     Between August 2018 to the present, MONTEALEGRE and GOMEZ regularly solicited UC-1 to conduct MPUs throughout the world.  These solicitations resulted in fourteen completed MPUs for a total of over $2 million laundered through the United States banking system.  Those fourteen MPUs are summarized below.  The communications summarized below between UC-1 and/or UC-2, on one hand, and MONTEALEGRE and/or GOMEZ, on the other hand, occurred over WhatsApp messenger in Spanish and have been recorded and translated. Those conversations are lengthy and span multiple months.

20.     According to CS-1, MONTEALEGRE prefers to discuss matters related to money laundering in person and is reticent to discuss such matters by telephone.  CS-1 does not typically have individual conversations with GOMEZ because CS-1's connection to the money laundering

organization is MONTEALEGRE.  Unless otherwise noted, in-person communications between CS-1 and MONTEALEGRE and/or GOMEZ were not recorded.  When CS-1 engaged in text messaging with MONTEALEGRE, whether through WhatsApp or traditional means, CS-1 usually provided those messages to law enforcement.  Those messages have been preserved.  However, to the extent that CS-1 had telephone conversations with MONTEALEGRE and/or GOMEZ, those conversations were not recorded, unless otherwise noted.

21.     When law enforcement conducted domestic MPUs, the conversations leading up to the MPUs were typically recorded by law enforcement.  The actual meetings between UCs and the couriers was also recorded and surveilled.  Foreign operations were conducted in accordance with the domestic law of that country.

### August 22, 2018:  MONTEALEGRE Arranged Contract with CS-1 and UC Picked Up $208,000 in Detroit, Michigan

22.     In or around August 20, 2018, UC-1 received information from CS-1 that CS-1 had negotiated an MPU in Detroit, Michigan, for approximately $300,000 and that MONTEALEGRE requested a dollar bill code (token) and a telephone number to make further arrangements.  UC-1 provided CS-1 with his telephone number and a dollar bill serial number.  UC-1 told CS-1 to tell MONTEALEGRE that MONTEALEGRE's associate need to provide the code "Primo departe Diego" when calling regarding the pickup.  MONTEALEGRE told CS-1 that he would provide accounts to receive the funds.

23.     The following day, UC-1 received a phone call from a private number and spoke to an individual later identified as an individual with the initials J.J.  J.J. provided the code to UC-1. After acknowledging the code, UC-1 asked J.J. how much were the "documents," and J.J. stated

"218."  UC-1 asked J.J. whether the "documents" were ready for pickup and where they were located.  J.J. responded that he was ready and that he was located on the west side of Detroit.  After additional discussion and calls, UC-1 told J.J. that UC-1's associate ("UC-3") would be conducting the pickup.  That same day, CS-1 told MONTEALEGRE that the transactions were scheduled to occur on August 22.  MONTEALGRE responded by sending CS-1 two photographs of account information for two bank accounts in Colombia to receive the funds.  CS-1 has provided those photographs to DEA agents.

24.     On August 22, 2018, UC-3 coordinated the pickup of the bulk cash from a courier, later identified as an individual with the initials N.W.:



 A later count of the money, which had been delivered in a bag, determined the total amount was

$207,915.    When CS-1 told MONTEALEGRE that the MPU had been completed,

MONTEALEGRE provided CS-1 with a third bank account in Colombia to receive the funds.

        25.     After the MPU, the money was subsequently deposited into the UC Account in

Boston.  On August 24, 2018, DEA agents arranged for three wire transfers from the UC Account

in Boston to the bank accounts designated by MONTEALEGRE in Colombia.  DEA agents sent photographs of the wire confirmations to CS-1, who in turn provided those confirmations to MONTEALEGRE.  Later that day, MONTEALEGRE asked CS-1 to provide information relative to the account that sent the funds in case the receiving bank had questions and to have documents prepared to cover the transactions with their bank.  Specifically, MONTEALEGRE requested the name of the bank, the name and address on the UC Account, and the type of business the corporation was involved in.  CS-1 provided MONTEALEGRE with the requested information.  MONTEALEGRE also requested an additional MPU in Detroit.

### August 27, 2018:  MONTEALEGRE Arranged Contract with CS-1 and UC Picked Up $228,000 in Detroit, Michigan

26.     While the August 22, 2018 MPU was still in progress, UC-1 received information from CS-1 that CS-1 had negotiated a MPU in Detroit, Michigan, for approximately $228,000 and that MONTEALEGRE requested a dollar bill code (token) and a telephone number to make further arrangements.  UC-1 provided CS-1 with his telephone number and a dollar bill serial number. UC-1 also gave CS-1 his undercover email address in order to have MONTEALEGRE provide the bank account instructions directly to UC-1.

27.     On or about August 24, 2018, UC-1 contacted J.J. to arrange for an additional MPU on behalf of MONTEALEGRE.  J.J. stated that the pick-up amount was "228."  UC-1 told J.J. that his associate, UC-3, would be available to make the pickup on August 27.  Also on August 24, 2020, MONTEALEGRE provided two corresponding bank accounts in the United States held by a money brokerage house in Colombia to CS-1 with instructions to wire the money to one of those accounts to the credit of a Colombian business entity.  Subsequently, on August 27, UC-3 made arrangements with J.J. for the delivery of the money and conducted the MPU of $228,170:



28.     After the MPU, the money was subsequently deposited into the UC Account in Boston.  On August 28, 2018, UC-1 received an email from andrestacha2018@gmail.com[3] with information for the same two bank accounts in Colombia that MONTEALEGRE had provided to CS-1 on August 24.  UC-1 responded to that email, asking how MONTEALEGRE wanted the amounts on the wire transfers and to which bank accounts.  According to CS-1, within minutes of that email, MONTEALEGRE told CS-1 about the email that UC-1 had sent.  MONTEALEGRE

---

3 During the course of this investigation, UC-1 regularly requested that MONTEALEGRE and/or GOMEZ send him an email with information or documents related to the scheme, such as fake documents to justify wire transfers. Each time that UC-1 received such an email, it was from a different, non-descript email address like this.

did not provide any specific instruction regarding how to divide the money up.  On August 29, 2018, two wire transfers were sent from the UC Account in Boston to one of the two bank accounts in Colombia and an account in Florida in accordance with the instructions that MONTEALEGRE had provided to CS-1 earlier.  On August 31, 2018, MONTEALEGRE sent an email to UC-1 asking for the wire tracking information to track the wire transfer to one of the bank accounts.  Later that day, UC-1 created a WhatsApp group chat with MONTEALEGRE, using phone number 57-321-758-7428 to establish direct communications with MONTEALEGRE (hereinafter, the "Group Chat").  Also included on the Group Chat was another undercover agent ("UC-2"), CS-1, and a fifth individual using phone number 57-321-758-4972, later identified as GOMEZ as set forth below.  On the Group Chat, UC-2 provided MONTEALEGRE and GOMEZ with the wire tracking information.  GOMEZ thanked UC-2 for the information.

### September 26, 2018:  MONTEALEGRE Arranged Contract with CS-1 and UC Picked Up $250,000 AUD in Sydney, Australia

29.     On or about September 21, 2018, UC-1 received information from CS-1 that CS-1 had negotiated a MPU with MONTEALEGRE in Sydney, Australia for approximately $200,000 AUD and that MONTEALEGRE requested a token to make further arrangements.  MONTEALEGRE also provided CS-1 with an Australian phone number to coordinate the MPU logistics with the Australian courier.  A DEA agent provided CS-1 an AUD serial number to be used as a code.

30.     On September 25, 2018, an undercover agent in Australia ("UC-4") made contact with the money courier in Australia, later identified as Felipe Arango.  CS-1 told MONTEALEGRE that contact had been made and that the MPU would take place on September 26.  Later that day, MONTEALEGRE sent CS-1 two photographs containing bank account

14

information.   CS-1 told MONTEALEGRE to send the information to UC-1, and MONTEALEGRE agreed to do so.

31.    On September 26, 2018, UC-4 made arrangements with Felipe Arango for the delivery of the money and conducted the MPU of $249,880 AUD, which was later converted into $177,515.74 USD.  After the delivery and at the direction of law enforcement agents, CS-1 asked MONTEALEGRE for documentation to support the wire transfers for both the August 27 and September 26, 2018 MPUs in case the bank asked questions about the transactions.  In response, MONTEALEGRE sent CS-1 a photograph via WhatsApp, which contained the name "Bull Pizzles," and told CS-1 that it was a product that was exported.  At the request of UC-1, MONTEALEGRE sent an email to UC-1's account with the bank account information for the wire transfers.  Both of the bank accounts were for the same money brokerage house in Colombia and for the Colombian business "Inversiones Y Asociados Praga SAS," which was the same business that received funds from the MPUs conducted on August 22 and 27, 2018.  On September 28, 2018, two wire transfers were sent from the DEA UC Account in Boston to the bank accounts designated by MONTEALEGRE.  Later that day, UC-2 sent GOMEZ a WhatsApp group message asking for documentation to support the wire transfers.  At approximately 12:51, GOMEZ replied to the group message and provided a fake invoice indicating that the company listed on the UC Account purchased Bull Pizzles from Inversiones & Asociados Praga SAS in the amount of $869,250.  An internet search by law enforcement agents revealed that "Bull Pizzles" are dog treats made from bull penis.

32.    On October 5, 2018, MONTEALEGRE sent a message on the Group Chat, "Gentlemen.  Let's Change the Number."  Based on his training and experience, UC-1 understood

MONTEALEGRE to be stating that he and GOMEZ would be changing their phone numbers. UC-1 asked for them to send their new numbers to UC-1 by email. Soon after, UC-1 received an email with Colombian phone numbers 57-313-5235474 (MONTEALEGRE) and 57-313-5218582 (GOMEZ). On October 6, 2018, UC-1 reformed the Group Chat with the new numbers.

33.     Law enforcement agents in Australia continued their investigation of Felipe Arango, which concluded on November 8, 2018. On that day, law enforcement surveilled Felipe Arango meeting with a number of individuals. That evening, law enforcement arrested Felipe Arango and found a small amount of cocaine on his person during the arrest. Subsequent surveillance of Felipe Arango's associates revealed them discarding items, such as a plastic drum, from a residence located in New South Wales. Australian law enforcement agents secured a search warrant for the residence later that evening and discovered that the residence was being used as a laboratory for what is suspected to be the extraction and refinement of cocaine. Hazmat units located several bottles of Acetone, Ammonia, and distilled water and volatile substance readings within the drainage systems were also detected, all of which led investigators to deem the residence a hazmat scene.

### October 16, 2018: MONTEALEGRE Arranged Contract with UC, UC Picked Up $150,000 in Los Angeles, California, and MONTEALEGRE Offered to Supply Drugs in Melbourne

34.     On or about October 11, 2018, MONTEALEGRE sent a message on the Group Chat, "I have a question, sir. Can you guys do it in LA and what is the minimum you guys accept." UC-1 replied, "We can, with a minimum of 100 and we charge 4% on our end." MONTEALEGRE responded, "OK, look at the offer, so we can contact with the people who can pay us here. We would like to take them up on it." Based on his training and experience, UC-1 understood

MONTEALEGRE to be asking UC-1 if he would pick up money in LA and what the smallest amount that UC-1 would accept as a contract.  UC-1 responded that the minimum was "100," meaning $100,000, with a charged commission of four percent.

35.     The following day, MONTEALEGRE sent a message on the Group Chat, "Guys, I need # and token for LA please.  Thank you."  UC-1 responded, "How much?"  MONTEALEGRE responded, "170."  UC-1 responded, "Dude, something even more certain, get me a # so we're not losing time, because sometimes nobody calls.  They wake up later over there, its early yet."  MONTEALEGRE responded, "Sir, we asked for it because we need it and you guys are the ones that give the #.  We're a group that already knows each other, what's the concern?"  Based on his training and experience, UC-1 understood MONTEALEGRE to be asking for a MPU in Los Angeles by requesting a phone number to call and a token to confirm the transaction.  Later that day, UC-1 sent a message on the Group chat with a picture of a dollar bill.  Based on his training and experience, the serial number of that dollar bill would function as the token.  UC-1 sent a second message, a telephone number for UC-5, a dollar bill to use as a serial number, and the code, "Lucho on behalf of Mario."

36.     On October 12, 2018, agents spoke with CS-1.  CS-1 stated that he met with MONTEALEGRE and GOMEZ in Cali, Colombia, earlier that day.  During the meeting, MONTEALEGRE and GOMEZ asked if CS-1 could pick-up $170,000 in Los Angeles.  They also asked if MPUs could be conducted in Trinidad, the Dominican Republic, Fiji, and Rio de Janeiro.  During the meeting, GOMEZ told CS-1 that he (GOMEZ) was a member of the group chat with CS-1, MONTEALEGRE, UC-1, and UC-2.  GOMEZ also discussed the accounts that were being used to receive disbursements from the MPUs and the need for MONTEALEGRE and GOMEZ

to have a secondary method of receiving money in Colombia.

37.    On or about October 13, 2018, UC-5 received a call from "Mario," who immediately provided the code issued by UC-1 to MONTEALEGRE.  From October 12 through October 16, UC-5 was in communication with Mario about conducting the MPU in the Los Angeles area.  On October 16, 2018, UC-5 and Mario made the final arrangements to meet in Montclair, California.  At the agreed upon location, UC-5 met with an associate of Mario who delivered $150,000 to UC-5 after verifying the token.

38.    Later that day, UC-1 sent a message on the Group Chat, "Buddy, they already deposited."  UC-1 was telling MONTEALGRE and GOMEZ that the MPU had been completed. GOMEZ sent a response, "Good, thanks."  UC-1 replied, "The guy said 150.  But I'll let you know the final count when I have it.  Maybe later, if not, tomorrow for sure."    MONTEALEGRE responded, "All right, sir.  Thank you."  UC-1 replied, "When you can please send me the accounts by email [UC Email Address].  Don't forget, please, send us the necessary paperwork to justify this deal, in the email, to have it ready in case the bank calls if there's an issue."  MONTEALGRE responded, "Yes, sir."    Later that evening, UC-1 received an email listing two bank accounts located in Colombia in the names of two separate businesses; Yeliz Sport, S.A.S and Lacteos La Hogarenas A.S.  Later that evening, GOMEZ indicated that $84,500 should be sent to Yeliz Sport and $59,450 should be sent to Lacteos La Hogarena.  On October 18, 2018, DEA agents arranged for the wire transfers from the UC Account in Boston to the two accounts designated by GOMEZ. UC-2 sent confirmation over the group chat and requested supporting documentation for the wires. GOMEZ responded by asking for information about the UC Account.

39.    On October 23, 2018, UC-1 received an email containing two fake invoices listing

18

the two business accounts provided by GOMEZ and the business listed on the UC Account.  The first invoice from Yeliz SAS stated that it was for the purchase of goods (girdle/belt) and the second invoice from HOGARENA SAS indicated that it was for the purchase of goods (dairy mix).

40.     On October 24, 2018, MONTEALEGRE sent UC-1 a WhatsApp message asking if UC-1 had an associate in Melbourne, Australia, that could purchase "melcocha" (literal translation refers to candy made in Ecuador).   Based on his training and experience, UC-1 understood MONTEALEGRE to be asking whether UC-1 had anyone in Melbourne that could buy drugs.   UC-1 replied back by asking "white or black?" (referring to cocaine or heroin).  MONTEALEGRE responded "white."   UC-1 asked MONTEALEGRE how many "pieces" (meaning kilograms) were available and a price.   MONTEALEGRE responded "30" that were going for "120."   UC-1 interpreted MONTEALGRE to be stating that he had 30 kilograms available for $120,000 AUD per kilogram.  UC-1 stated that his associates were not interested in "melcocha" at this time.

### November 13, 2018:  GOMEZ Arranged Contract with UC and UC Picked Up $250,000 in Detroit, Michigan

41.     On or about November 12, 2018, GOMEZ sent a message on the group chat asking UC-1 if he could conduct a MPU in Detroit for $250,000 and requesting a telephone number and a token.  UC-1 told GOMEZ that he could.  After reaching an agreement, MONTEALEGRE said that they needed the number for the MPU.  UC-1 also provided MONTEALEGRE and GOMEZ with a telephone number, a dollar bill to use as a serial number, and the code, "behalf of el Viejo."

42.     Later that day, UC-1 received a call from J.J., who immediately provided the code.  UC-1 recognized J.J.'s voice form earlier MPUs.   J.J. confirmed that he had "250" ready for

19

pickup and that the pickup was located in Detroit.  UC-1 told J.J. he would make the arrangements and call him back.  Later that evening UC-1 sent J.J. a text message with the contact information for UC-6.  Later that night, UC-6 received a call from J.J. and made arrangements to conduct the MPU the following day.  On November 13, 2018, UC-6 met with an individual later identified as M.S. who delivered $249,850 after verifying the token.

43.     Later that day, UC-1 contacted MONTEALEGRE and GOMEZ on the group chat and told them that the MPU had been completed.  UC-1 requested GOMEZ send him the accounts by email.  Later that evening, UC-1 received an email listing four bank accounts:  the Yeliz Sport, S.A.S and Lacteos La Hogarenas A.S. that were previously provided as well as two United States based accounts.  UC-1 responded by requesting that GOMEZ provide additional information as to one of the United States accounts and also for documentation supporting the transactions.  On November 15, 2018, GOMEZ responded by asking for information about the UC Account, which UC-1 provided.

44.     On November 15, 2018, UC-1 received an email containing two fake invoices listing the two Colombia-based business accounts provided by GOMEZ and the UC Account.  The first invoice from Yeliz SAS stated that it was for the purchase of goods (girdle/belt) and the second invoice from HOGARENA SAS indicated that it was for the purchase of goods (dairy mix).

45.     On November 16, 2018, DEA agents sent the wire transfers from the UC Account in Boston to the four accounts designated by GOMEZ.  UC-2 sent confirmation over the group chat and requested supporting documentation for the wires.

### November 20, 2018:  GOMEZ Arranged Contract with UC, UC Picked Up $250,000 in Detroit, Michigan, and Seizure of Drugs Involving Couriers

46.     On or about November 15, 2018, GOMEZ sent a message on the group chat asking UC-1 if he could conduct another MPU in Detroit for $250,000 and requesting a telephone number and a token.  UC-1 told GOMEZ that he would take the MPU and provided MONTEALEGRE and GOMEZ with a telephone number, a dollar bill to use as a token, and the code, "behalf of Negro."

47.     Later that day, UC-1 sent J.J. a text message asking if J.J. had another "250" ready for pickup.  J.J. responded that he was not ready to conduct the MPU yet.  Later that evening, UC-1 called J.J. in response to a missed call.  J.J. said that he would be ready to deliver another 250 in a couple of days.

48.     On November 18, 2020, UC-1 called J.J. in response to a missed call.  During the call, J.J. told UC-1 that he now had 250 ready for pickup in Detroit.  UC-1 told J.J. that UC-6 would contact J.J. to make arrangements for the MPU.  That night, UC-6 called J.J. and made arrangements to conduct the MPU on November 20, 2018.  On November 20, 2018, UC-6 again met with M.S., who delivered $249,780 after verifying the token.

49.     Later that day, UC-1 contacted MONTEALEGRE and GOMEZ on the group chat and told them that the MPU had been completed.  GOMEZ responded that he had already sent UC-1 the accounts by email.  UC-1 asked GOMEZ for documentation to support the wire transfers.  GOMEZ responded by confirming that the sending account was the same in the prior transaction.  Later that evening, UC-1 checked his undercover email and noted an email listing three bank accounts:  the Yeliz Sport, S.A.S and Lacteos La Hogarenas A.S. that were previously provided

as well as a third United States-based account.

50.     On November 21, 2018, UC-1 received an email containing two fake invoices listing the two Colombia-based business accounts provided by GOMEZ and the UC Account.  The first invoice from Yeliz SAS stated that it was for the purchase of goods (girdle/belt) and the second invoice from HOGARENA SAS indicated that it was for the purchase of goods (dairy mix). Subsequently, DEA agents arranged for the wire transfers from the UC Account in Boston to the three accounts designated by GOMEZ.

51.     On November 26, 2018, law enforcement agents conducted physical surveillance of M.S. at his residence in Detroit, Michigan. Agents saw M.S. meeting with two other men and watched M.S. help the men load a vehicle on a U-Haul trailer.  Law enforcement agents subsequently conducted a vehicle stop of the two men driving the trailer that was towing the vehicle.  That stop resulted in the seizure of 6 kilograms of suspected heroin from a concealed compartment in the towed vehicle and a Glock 10mm semi-automatic handgun.  Law enforcement agents subsequently executed a search warrant at the residence of M.S. in Detroit.  The search warrant resulted in the seizure of approximately $150,000, a semi-automatic handgun, an SKS assault rifle with a loaded Beta C-mag containing 100 rounds of 7.62 caliber ammunition, and other documentary evidence detailing the drug trafficking activities of the J.J. drug trafficking organization.

### December 11, 2018:  GOMEZ Arranged Contract with UC and UC Picked Up $400,000 in Los Angeles, California

52.      On or about November 28, 2018, UC-1 received a WhatsApp message from GOMEZ, using phone number 57-313-5218576.    GOMEZ provided UC-1 with

MONTEALEGRE's new phone number as 57-313-5216087 in order to re-form the Group Chat. CS-1 also confirmed that number as MONTEALEGRE's new number.  On or about December 1, 2018, GOMEZ sent a message on the group chat stating that he had an MPU in Los Angeles for "400" in Los Angeles, California and requesting a telephone number to make the arrangements. On December 3, 2018, UC-1 replied to GOMEZ with a telephone number, a dollar bill to use as a token, and the code, "calling on behalf of Tio."

53.     On December 8, 2018, UC-1 returned a missed call and spoke with an unidentified Hispanic male ("UM1").  UM1 provided UC-1 with the code "calling on behalf of Tio."  UC-1 asked UM1 how many miles the car had (referring to US currency) and UM1 responded, "100." UC-1 asked where the car was located and if it was ready for pick-up.  UM1 responded that it was and that he would provide the pick-up location shortly.  A few minutes later, UC-1 received a text message with a meet location in Norwalk, California.  Later that evening, UC-1 called UM1 and told him that UC-1 would be sending an associate to make the pickup the following week. Subsequently, UC-7 called UM1 and began making arrangements to conduct the MPU.   On December 10, 2018, UC-7 and UM1 agreed to conduct the MPU on December 11, 2018. Subsequently, on December 11, 2018, UC-7 met with an associate of UM1 and took delivery of $100,000.

54.     On December 12, 2018, UC-1 contacted MONTEALEGRE and GOMEZ on the group chat and told them that the MPU had been completed.  UC-1 told GOMEZ that the same UC company account would be used and requested documentation to support the wire transfers. On December 13, 2018, GOMEZ sent UC-1 a message that he had emailed the bank account information to UC-1.  After receiving that message, UC-1 saw that he had received five e-mails

with bank account information.   The five bank accounts were United States-based accounts, including one in the name of Jorge GOMEZ.  Later that day, DEA agents arranged for the wire transfers from the UC Account in Boston to the five accounts designated by GOMEZ.

55.     On December 17, 2018, UC-1 received an email containing a fake invoice justifying one of the wire transfers in the name of Sochers Tech LLC.  The invoice indicated that the wire was for the purchase of computer parts and electronics.

### July 24, 2019:  MONTEALEGRE/GOMEZ Arranged Contract with UC and UC Picked Up $17,000 in Hartford, CT

56.     On or about July 19, 2019, CS-1 contacted UC-1 and reported that MONTEALEGRE was requesting assistance for a $32,000 MPU in Hartford, Connecticut.  UC-1 told CS-1 that UC-1 would contact MONTEALEGRE directly.  At approximately 11:08 a.m., UC-1 sent MONTEALEGRE/GOMEZ[4] a WhatsApp message to 57-301-706-3659 that he would accept the Hartford MPU.[5]   MONTEALEGRE/GOMEZ responded by requesting a telephone number and a token.  Thereafter, UC-1 provided MONTEALEGRE/GOMEZ with a telephone number, a dollar bill to use as a token, and the code "looking for Chino on behalf of Parcero."

57.     On July 22, 2019, UC-1 returned a missed call and spoke with an individual later identified as H.G.  H.G. provided UC-1 with the code "looking for Chino on behalf of Parcero."  UC-1 asked H.G. how many miles the car had (referring to US currency) and H.G. responded, "32."  UC-1 confirmed with H.G. that H.G. was located in Hartford.  UC-1 told H.G. that he would make the pickup arrangements and call him back. UC-1 called H.G. later that day and told him

---

4 As set forth below, MONTEALEGRE later indicated to CS-1 that GOMEZ was the primary user of the phone when communicating with UC-1 about money laundering activities.
5 Based on the unavailability of UC-2, the Group Chat had been discontinued.

that UC-1 would be sending an associate to make the pickup the following week.  Subsequently, UC-8 called H.G. and began making arrangements to conduct the MPU.  On July 23, 2019, UC-8 met with H.G. to conduct the MPU.  During the meeting, UC-8 called UC-1 because H.G. stated that he did not have the full amount.  UC-8 then handed his cellular phone to H.G.  UC-1 asked H.G. what the pickup amount was and H.G. responded, "17."  UC-1 told H.G. that he would not have accepted the contract for such a small amount but told UC-8 to take the currency.[6]  Thereafter, UC-8 completed the MPU for $17,050.

58.     After the MPU, UC-1 attempted to place a call to MONTEALEGRE using WhatsApp, but MONTEALEGRE did not answer.  UC-1 then texted MONTEALEGRE/GOMEZ and told him that the MPU had been conducted, that it was for "17" and that he would not accept small amounts on future transactions.  MONTEALEGRE/GOMEZ responded by thanking UC-1 and apologizing for the inconvenience.

59.     On July 24, 2019, UC-1 sent MONTEALEGRE/GOMEZ a text message asking for MONTEALEGRE to call him.  MONTEALEGRE/GOMEZ responded that he would not call UC-1 and preferred to use WhatsApp messenger.  UC-1 replied that he was charging an additional fee for expenses during the transaction and requested wire transfer instructions from MONTEALEGRE/GOMEZ.  MONTEALEGRE/GOMEZ confirmed that he would send the details to UC-1's email.   On July 25, 2018 UC-1 saw that he had received two e-mails with bank account information.  Later that day, MONTEALEGRE/GOMEZ sent a second email replacing one of the accounts.  Later that day, DEA agents arranged for the wire transfers from the UC Account in Boston to the two accounts designated by MONTEALEGRE/GOMEZ.

---

[6] This conversation was not recorded.

**August 20, 2019:  MONTEALEGRE/GOMEZ Arranged Contract with UC and UC
Picked Up $200,350 AUD in Sydney, Australia**

60.     On or about August 3, 2019, MONTEALGRE/GOMEZ sent UC-1 a WhatsApp message indicating that his new number was 57-300-272-6825.  On or about August 12, 2019, MONTEALEGRE/GOMEZ sent a message to UC-1 that he had a MPU for $200,000 AUD in Sydney, Australia. and requesting a telephone number to make the arrangements.  UC-1 later responded to MONTEALEGRE/GOMEZ with a telephone number, an AUD bill to use as a token, and the code, "looking for Lucho on behalf of Chino."

61.     On or about August 18, 2019, an undercover agent in Australia ("UC-8) made contact with the money courier in Australia and made plans to conduct the MPU on August 20, 2020.  On August 20, 2020, UC-8 made arrangements with "Amer" for the delivery of the money and conducted the MPU of $200,350 AUD, which was later converted into $132,711.84 USD.

62.     On August 21, 2019, UC-1 sent MONTEALEGRE/GOMEZ a message with the final count and requested wire transfer instructions be sent to UC-1's email.  The following day, UC-1 saw that he had received an email with the bank account information for four U.S.-based bank accounts.  Later that day, UC-1 texted MONTEALEGRE/GOMEZ a message asking for a fifth bank account.  UC-1 then received an email with information regarding a Canada-based account.  DEA agents arranged for the wire transfers from the UC Account in Boston to the accounts designated by MONTEALEGRE/GOMEZ to be sent on August 22 and 23, 2019.

**September 4, 2019:  MONTEALEGRE/GOMEZ Arranged Contract with UC and
Australian CS Picked Up $200,000 AUD in Sydney, Australia**

63.     On or about August 29, 2019, MONTEALEGRE/GOMEZ sent a WhatsApp message to UC-1 that he had another MPU in Sydney, Australia, this time for $300,000, and

requesting a telephone number and token to make arrangements.  UC-1 later responded to MONTEALEGRE/GOMEZ with a telephone number, an AUD bill to use as a token, and the code, "looking for Lucho on behalf of Parcero."

64.     On or about September 3, 2019, an Australian confidential source made contact with the money courier in Australia and made plans to conduct the MPU on September 4, 2019. On September 4, 2019, an Australian confidential source met with an individual later identified as J.L. and conducted the MPU of $200,000 AUD, which was later converted into $133,140 USD.

65.     On September 6, 2019, UC-1 sent MONTEALEGRE/GOMEZ a WhatsApp message to UC-1 with the final count and requested wire transfer instructions be sent to UC-1's email.  That same day, UC-1 saw that he had received emails with the bank account information for five US-based accounts.  Later that day, DEA agents arranged for the wire transfers from the UC Account in Boston to the five accounts designated by MONTEALEGRE/GOMEZ.

### September 10, 2019: MONTEALEGRE/GOMEZ Arranged Contract with UC, New York CS Picked Up $100,000 in New York, New York, and Drug Seizure from Courier

66.     On or about September 6, 2019, MONTEALEGRE/GOMEZ sent a message to UC-1 that he had a MPU in New York for $100,000 and requesting a telephone number and token to make arrangements.  UC-1 later responded to MONTEALEGRE/GOMEZ with a telephone number, and dollar bill to use as a token, and the code, "looking for Tokyo on behalf of Parcero."

67.     On or about September 8, 2019, a New York-based confidential source made contact with an individual later identified as Hector Tolentino.  After multiple calls, they made arrangements to conduct the MPU on September 10, 2019.  On that day, the New York based confidential source met with Hector Tolentino and conducted the MPU of $100,010.  Surveillance

agents monitored the entire meeting and positively identified Tolentino meeting with the New York-based confidential source.  Tolentino was the subject of another DEA investigation in New York at the time.

68.     Later that night, UC-1 sent MONTEALEGRE/GOMEZ a message with the final count and requested wire transfer instructions be sent to UC-1's email.  The following day, UC-1 saw that he had received emails with the bank account information for five US based accounts. DEA agents arranged for the wire transfers from the UC Account in Boston to the five accounts designated by MONTEALEGRE/GOMEZ to be sent on September 11 and 12, 2019.

69.     New York DEA agents continued investigating Tolentino.  Based on surveillance images from a hallway camera obtained by New York DEA agents, investigators confirmed that, in early December 2019, Tolentino and an associate entered a specific apartment in Queens, New York, on several occasions.  On December 17, 2019, surveillance officers observed Tolentino and the same associate exit the Queens apartment in possession of a garbage bag and discard it next to a tree between the apartment building and the street.  Law enforcement agents recovered the garbage bag and found gloves, masks, and plastic wrappers that are consistent with packaging kilogram-sized packages of narcotics.  The bag also emitted an odor associated with cocaine.

70.     On or about December 18, 2019, law enforcement approached the associate of Tolentino and told him what they had found the previous day.  The associate provided consent to a search of the apartment by law enforcement.  Inside, law enforcement found 2.8 kilograms of a substance that field-tested positive for cocaine, suspected heroin and fentanyl, firearms, a hydraulic press, an electronic money counter, a scale, and masks.

71.     Based on the investigation, later the same day, New York DEA agents arrested

Tolentino.   After waiving his Miranda rights, Tolentino was interviewed by investigators and stated that, on or about December 17, 2019, he traveled from Queens, New York, to New Jersey, where he obtained 24 kilograms of substances that he understood to be heroin, cocaine, and fentanyl.

### October 8, 2019:  MONTEALEGRE/GOMEZ Arranged Contract with UC and Australian CS Picked Up $300,000 AUD in Sydney Australia

72.     On or about September 30, 2019, MONTEALEGRE/GOMEZ sent a WhatsApp message to UC-1 that he had another MPU in Sydney, Australia for $300,000 and asked if UC-1's associate was available to complete the MPU.   UC-1 agreed to do it and later responded to MONTEALEGRE/GOMEZ with a telephone number, an AUD bill to use as a token, and the code, "looking for Santiago on behalf of Parcero."

73.     On or about October 2, 2019, an Australian UC made contact with the money courier in Australia.   On October 7, 2019, the Australian UC contacted the money courier and made plans to conduct the MPU on October 8, 2019.   On October 8, 2019, an Australian confidential source met again with J.L.7 and conducted the MPU of $300,000 AUD, which was later converted into $199,020 USD.

74.     On October 10, 2019, UC-1 sent MONTEALEGRE/GOMEZ a message with the final count and requested wire transfer instructions be sent to UC-1's email.   That same day, UC-1 saw that he had received emails with the bank account information for six United States-based

_____

7 Subsequent investigation of J.L. revealed that he was associated with a suspected methamphetamine drug trafficking organization.   During the week of September 14, 2020, as part of the ongoing investigation into J.L and others, the Australian Border Force searched a cargo shipment of refrigerators that was sent from Malaysia.   Hidden in the shipment was approximately 180 kilograms of methamphetamine.

accounts and one account located in Tortola, BVI. UC-1 asked for MONTEALEGRE/GOMEZ to confirm the Tortola account as an international wire transfer and MONTEALEGRE/GOMEZ responded by providing UC-1 with another United States-based account. DEA agents arranged for the wire transfers from the UC Account in Boston to the accounts designated by MONTEALEGRE/GOMEZ to be sent on October 11 and 15, 2019.

75.     On October 15, 2019, UC-1 asked MONTEALEGRE/GOMEZ to confirm receipt of the wire transfers. MONTEALEGRE/GOMEZ responded that he had not received the $100,000 wire transfer to Maximati C.A. LLC, a Florida-based account. UC-1 noted that the funds had not been debited from his account and asked MONTEALEGRE/GOMEZ for documentation to support the wire transfer so that he could question the bank. MONTEALEGRE/GOMEZ responded by requesting the UC account information. Later that day, UC-1 received an email with a fake invoice made out to the undercover company, noting that the wire transfer was for the purchase of electric generators. DEA agents arranged for the final wire transfer later that day.

## Additional identification of MONTEALEGRE and GOMEZ

76.     On March 7, 2018, law enforcement agents in Colombia conducted a motor vehicle stop of a vehicle in which both MONTEALEGRE and GOMEZ were riding. During the stop, agents found and seized 300,000,000 Colombian pesos (approximately $100,000 USD). Both MONTEALEGRE and GOMEZ were positively identified through their Colombian cedulas.

77.     During some of the transactions described above, MONTEALEGRE and/or GOMEZ directed that funds be sent to a Bank of America account in Salem, New Hampshire, under the name Jorge Gomez. Searches of a law enforcement database revealed that Gomez listed on the account had a spouse and also purchased a single family residence in Parkland, FL, in 2003.

According to a search of the Florida Registry of Motor Vehicles, Jorge Gomez, with the same birthday as was listed on GOMEZ's Colombian cedula, was issued a Florida driver's license in July 2004.  The driver's license indicated that Gomez was not a United States citizen and it expired in 2006.  Law enforcement agents reviewed the photograph on the Florida driver's license and concluded that it was of GOMEZ.  Specifically, the driver's license photograph appeared to be the same person previously identified by CS-1 and depicted on the cedula identified by law enforcement agents in Colombia during the March 2018 seizure.  Law enforcement agents also reviewed ICE records, which revealed that GOMEZ entered the United States on a tourist visa in July 2017 which was valid until January 2018.

78.     On January 21, 2020, CS-1 had a chance meeting with MONTEALEGRE and GOMEZ at the Cosmo Central Shopping Mall in Cali, Colombia.   During the meeting, MONTEALEGRE told CS-1 that UC-1 believed that he was exchanging messages with him (MONTEALEGRE) when they were discussing/negotiating MPUs but that UC-1 was actually and usually communicating with GOMEZ during the exchanges.  MONTEALEGRE said that he does respond on occasion, implying that he and GOMEZ share the phone being used to communicate with UC-1 relative to money pick-ups. MONTEALEGRE also told CS-1 that GOMEZ managed the accounts.

79.     After learning about this meeting from CS-1, law enforcement in Colombia contacted the security office of the mall and secured the security video footage from when CS-1 said the meeting occurred.  A review of that video footage confirmed that CS-1 met with two individuals strongly resembling MONTEALEGRE and GOMEZ.  However, the surveillance camera was not close enough to where the meeting occurred to clearly see their faces.

80.     On March 5, 2020, CS-1 met with MONTEALEGRE in Cali, Colombia, at the direction of DEA agents.  The meeting occurred in MONTEALEGRE's office and was audio recorded by CS-1.  During the meeting, the CS and MONTEALEGRE primarily discussed money laundering, to include some of the UC transactions that had been completed in the past. MONTEALEGRE told the CS-1 that GOMEZ is in charge and that GOMEZ is the person who knows about the accounts.  In particular, MONTEALEGRE reported to CS-1 that when UC-1 is contacted and asked to pick up money for them, the communication of that request is from GOMEZ to UC-1.  MONTEALEGRE stated that GOMEZ holds the phone that communicates with UC-1.  MONTEALEGRE told CS-1 that he did not want to be in the middle between GOMEZ and UC-1, because GOMEZ is in charge of all the transactions and accounts.  However, MONTEALEGRE made numerous statements during the meeting that he was fully aware and involved in the transactions between GOMEZ and UC-1.  For example, MONTEALGRE showed CS-1 his phone indicating that MONTEALGRE has numerous MPUs available in the United States for under $100,000.

81.     In August 2020, MONTEALEGRE/GOMEZ solicited two MPUs in New York from UC-1 for approximately $100,000 total.  Those MPUs followed the same pattern as the ones described elsewhere in this affidavit.  Since the date of those MPUs, MONTEALEGRE/GOMEZ continue to solicit UC-1 for MPUs throughout the world.  Those solicitations have continued through and including requests made in December 2020.  However none of those communications have resulted in completed contracts with UC-1.

## **CONCLUSION**

82.     Based upon the information developed during this investigation and set out in this affidavit, there is probable cause to believe that MONTEALEGRE and GOMEZ are participants in a Money Laundering Conspiracy, in violation of Title 18, United States Code, Sections 1956 (a)(1)(B)(i) and (h).

I declare that the foregoing is true and correct.

Ryan Talbot
IRS-CI Special Agent

Sworn via telephone in accordance with Fed. R. Crim. P. 4.1
this 28 th day of December, 2020.

HONORABLE DONALD J. CABELL
UNITED STATES MAGISTRATE JUDGE